The last case for argument is 17-1325 District of North Dakota United States v. Calvin Bernhardt  Your Honors, I've presented six issues in my blue brief, which I recognize is a lot. And I imagine Your Honors might have some ideas as to where I should go. So I'm certainly happy to take your lead. In the absence of that, I'd like to start with what I think are the easiest issues and then move on to some of the more difficult ones. The first one is the issue of the counterfeit obligations. There was insufficient evidence to prove that my client possessed these counterfeit obligations. To be criminally liable, you have to have the intent to defraud, and the obligations have to be a similitude of real money. The obligations in this case were clearly fakes, and there was no intent or no suggestion in the record that Bernhardt had any intent to pass these or defraud anybody. Well, couldn't it, from the full context of this case, it be that, and I think the government kind of makes this argument, that he was working to perfect his craft to get it a little bit better in terms of the successfulness of the fake money, and that in the context of the case, sending fake money overseas to someone might be a little more successful with a person not as familiar with American currency. It's not an element of the law that you're working to perfect your currency. The currency he had was obviously fake. As for the money transfers, there's a record that he actually did send real money. These are Western Union transfers. He's not going to send fake cash through the mail, so I don't think the government's route there is going to lend it much success. The government uses the Armstrong case in its support, but in that case, the defendants actually passed counterfeit currency, and they commingled it with real currency. That's a counterfeit obligation case. All we have here is somebody printed up some fake money and put it in a cabinet in his basement and let it sit there dusty, and that's it. As far as the attempted exploitation of a child, the attempted travel to the Philippines, there was simply no act. All Bernhardt did was talk a good game, and while it's repulsive and unsavory and we don't like it, there was no act whatsoever, much less a substantial step. There was simply no attempted exploitation. The government there cites various cases, Spurlock, Young, Patton, but in all of those cases, the defendant actually traveled to the location where he thought the minor would be, and it was at that location that he was arrested. Clearly, those cases reflect attempted exploitation of children. Not here, when he talks about going to a hotel in the Philippines, and that's it. The next issue is the, and this is probably the most difficult, this would be the most difficult for me to win, but I think it's important. Bernhardt's 600-month sentence was entirely unreasonable. The core of this indictment is seven images that Bernhardt received, and again, while this is bad conduct, it's unsavory, it's disgusting, we want to discourage it, throughout this court's case law, you've got individuals who possessed many more images, individuals who physically abused children, and they received much lower sentences. This is a life sentence. This is a life sentence for seven images. The sentence was incredible. What was his statutory maximum? I don't believe there was one. It can go up to life, and indeed it did. He wasn't perhaps sentenced to life, he was sentenced to 600 months, but it's all the same. It was unreasonable. I'd like to turn now to this issue of corrupt persuasion when it comes to witness tampering. Under the statute, there was no other prong of witness tampering that Bernhardt could have been convicted of except for this corrupt persuasion. There is a circuit split, which I believe the government acknowledged. I think there's also an intra-circuit split. This court's cases in Jackson and Thompson seem a little different. On the one hand, you've got the Farrell case from the Third Circuit, which every other court's definition of corrupt persuasion seems to take from, and then of course you've got the Supreme Court's opinion in Arthur Anderson. Both of those cases hold that corrupt persuasion means something more than persuasion to hinder communication to law enforcement or even persuasion to withholding documents. Was the jury instruction objected to? It was not, Your Honor. We're looking at clear error here. You mean plain error? Plain error, yes, Your Honor. There are two bases for my argument here. One is the jury instructions were incorrect, but one is there was insufficient evidence to prove witness tampering because there was simply, according to the definition of corrupt persuasion that I would like this court to formally adopt if it hasn't done so already, there was insufficient evidence to find that Bernhardt corruptly persuaded or tried to corruptly persuade the mom in the Philippines. Didn't he basically tell her, warn her that the police were searching and not to cooperate? And under the Farrell analysis and more importantly under the Arthur Anderson analysis, that's not corrupt persuasion. You can ask somebody not to cooperate with police. I think when there's coercion involved, when you're asking somebody to violate a legal duty, then you've got corrupt persuasion. How about asking somebody to lie? Asking somebody to lie is very clearly corrupt persuasion. I know where Your Honor is going. He says, you don't know me, if I'm not mistaken. Perhaps I'm being a little forward. You know, that was one short statement in some desperate texts. I think it was mere rhetoric. You don't know me means don't say anything. I would refer this Court to cases like NAACP versus Claiborne Hardware where the Supreme Court held that if you go into any of those white-owned businesses, we'll crack skulls was seen as mere rhetoric. I would turn this Court's attention to the recent Supreme Court case, Alonis versus United States, in which the defendant posted violent rap lyrics online that he created and the Supreme Court held that they weren't actually true threats because he didn't mean it, even though on the surface they sounded like true threats. That's what we have here. It's one line in a text, you don't know me, in the context of him essentially telling the mom, don't say anything. You know, I would add a couple things to my argument regarding corrupt persuasion. If we knew what the tone of voice was, would that make a big difference? It certainly could, Your Honor. We don't have the tone of voice, of course. I know, I know we don't. It's inquiring about your viewpoint. Absolutely, it could. The tone of voice could make a big difference. I wonder if we have tone of text here. The tone of text here is don't say anything, I'm desperate, please don't talk to police. And I think that's the ultimate takeaway as to what he was really saying. And so regarding corrupt persuasion, of course, we have the Farrell and Arthur Anderson cases on the one hand, and I would ask this Court to adopt that view. On the other hand, of course, we have the Schatz and Thompson cases where corrupt persuasion is defined as persuasion that is motivated by an improper purpose. I think this Court has flirted with that definition. If it hasn't actually adopted it, if it has, I would ask that it revisit its decision. Motivated by an improper purpose is as ambiguous as the term corrupt persuasion itself. And, of course, with the Arthur Anderson case, the Supreme Court probably superseded this motivated by an improper purpose standard, holding it more than just asking somebody not to talk to police or even, as in the Arthur Anderson case, telling people to destroy documents even with the knowledge that there's a government investigation going on. When Arthur Anderson started to destroy those documents, they knew that the Securities and Exchange Commission was fishing for violations regarding Enron. Same situation here. I'd move on, if I could, to the question of whether charging Bernhardt with two counts of witness tampering is multiplicitous. Each of the sets of texts that constitute the factual basis for the witness tampering occurred very close in time. It seemed to me, looking at the evidence, that they occurred within about 23 minutes of each other. The government says it's seven or eight hours. That might have something to do with the time change between here and the Philippines. It's a little unclear, I suppose. But even with a time difference of seven or eight hours, the primary thing that this court looks to is the congressional intent to determine what Congress thought the unit of prosecution should be. What we have here is one person telling another, in virtually identical language, in a very short period of time, to not talk to police. Both of the requests are identical. These are not two separate crimes. This is one crime that spanned, at most, seven or eight hours. Beyond that, this court looks to whether two different sets of facts constitute a different transaction and whether the two sets of facts constitute a distinct impulse. It seems to me obvious that there's one impulse here. Mom, please don't talk to the police. There's only one transaction. Mom, please don't talk to the police. Based on that, I think that both of the charges tried together, charged together and convicted together, constitute a multiplicity. So I'd ask this court to reverse at least one of those. Moving on to the jury instructions, we have a problem with the jury instruction on attempt, attempted exploitation, and then we have the problem with the jury instruction on corrupt persuasion as it relates to the tampering charges. As far as attempt goes, the instruction was fine as far as it said a substantial step is necessary but not necessarily the last act. But what it didn't mention is that this court has held that an act, and not talk, is necessary.  There wasn't an objection, was there? There was not an objection, so it absolutely would be plain error. But it seems to me that leaving out these incredibly important and relevant to this case instruction would have been plain error on the court's part. The court should have caught it. Whether the trial attorney did or not, obviously that attorney didn't, the court should have caught this glaring error. Especially in a case like this where the conduct underlying the supposed attempt was just talk and there was no act. And then, of course, the jury instruction on corrupt persuasion. The instruction was to persuade with consciousness of wrongdoing. That language comes directly from Arthur Anderson and Farrell. As I've already mentioned, I think those two cases suggest a much more narrow and I would say defendant-friendly instruction. I have about two and a half minutes left. If you have no more questions, I'd like to reserve that for rebuttal. Thank you. Mr. DeLorme. May it please the Court. Counsel. Good afternoon, Judge Smith, Judge Colleton, Judge Murphy. My name is Gary DeLorme, and I represent the United States in the matter now before the Court. And I was also the lead trial counsel for the matter before the Court. Starting, I guess, from where Mr. Morrison went, I think he kind of jumped around. He went issue one first, the counterfeit money. When we talk about the counterfeit money and the insufficiency of the evidence that's being raised by Mr. Morrison, I think one needs to look at all of the additional pieces of evidence that the jury would have looked at. When we look at U.S. v. Londo Dito, intent to be proven by circumstantial evidence, in this case the jury, they didn't just hear that this was fake money. What they got was they got evidence that there was approximately $35,000 in counterfeit 20s and $50 bills. That's a large stack of fake money, indeed more so than one would have if they were just horsing around and trying to make fake money to play poker or any other kind of games. They also got information indicating that some of the bills used different serial numbers. Again, it was a little step beyond just somebody who was looking at, horsing around, making fake money for some sort of games. They also got evidence of the differing papers used in the production of these counterfeit bills. One of the witnesses testified that some of them was pretty flimsy paper, some was like card stock, but that same witness also indicated that it appeared to him, in his experience, that this individual, whoever made this money, was in a production line trying to perfect the product. Now, I know Mr. Morrison talks about, well, there was no evidence that he tried to pass it or no evidence that this was passable money. The same witness indicated that in a bar type of setting, intermixed with normal, regular bills, some of this money could have been passed or attempted to be passed in a manner to defraud. So the jury definitely had sufficient evidence to look at in determining what the intent of Mr. Bernhardt was with possessing this particular money. Counsel, I have a curiosity on a different issue, and that's the evidence adduced to prove a substantial step in the attempt to travel. What's the evidence here that he was ever going to the Philippines? That's a good question, Judge Smith, and I will tell you what the jury got to hear throughout the trial from the witnesses. They got to hear that these communications, these weren't just talk. These communications were grooming attempts by Mr. Bernhardt to groom L.O.B. in an effort to sexually exploit her via the Internet to get these images, but also then to reward her with money, money that she needed because she was a very poor child living in a slum in the Philippines. There was that grooming aspect. Secondly, they got to see that he groomed her into this ideal of him traveling to Manila. He communicated with her and told her he was going to come there and he was going to spend some time with her, and that when he got there, there was going to be games, sex games in a hotel, and that he was going to spend a week with her and that he was going to spend that week with her in an environment where anything goes. He promised her $25,000 PHP, roughly $480 United States currency, to spend that one week. So there's this negotiation and this reward that he's presenting to this child. So that's promises and intent, but where's the proof of a step of actually... These are all steps that, when you combine them together, Judge Smith, when you look, he talks about the hotel, he talks about that 20 times. He grooms the mother to allow that type of conduct to occur. When you look at case law in Spurlock, persuading a mother to allow exploitation is a sufficient, substantial step. There's no difference here in that he told the mother, I'm coming there to be with you, but I want Princess too. That all goes to the element of his purpose for the travel. But what I'm talking about is the proof of the actual attempt to travel or traveling. And that comes in when one of the witnesses testified that he had talked to somebody in a jail call and indicated that he had done the research. He had taken a step to do the research on what it would take to travel to the Philippines, to Manila. When you add it all together, it's all a large, substantial step. He wouldn't go to Manila, he wouldn't make... The jailhouse snitch testimony that he... It's a jail call, Your Honor. It was him talking to, I believe, his brother in between dependency of detention and trial. So when you look at it all together, he wouldn't have made... He was getting close. This was two weeks prior to most of the communication with the mother talking about going to the Philippines and spending this time with the LOB in the hotel room was two weeks prior to the search warrant and this whole thing coming to law enforcement attention. When you look at all of that, he's taken that substantial step of grooming the child in preparation, grooming the mother to allow it. But what gets passed from your preparation? This would pass from your preparation, Your Honor. He not only groomed them, but he also negotiated a price. He talked to them about what he was going to provide to them once he got there Going on to Issue 5, which was one of the issues that was talked about next in the line. The reasonable sentence that the court issued in this case, I know Mr. Morrison indicated, well, it was only seven images. Well, there was far more than that that the judge got to see. The judge got to see a very depraved individual that used blackmail and threats to get this minor child to continue to send him images of herself in a sexually exploitative manner, sadomasochistic images using clothespins. He also got to hear in prior trial about another individual that was being groomed for victimization in the United States. We did not ultimately call that individual at trial, but that would have been something that the court would have reviewed and that the court had made that determination under 413 and 414 to allow at trial. We determined, though, in trial that we already had a pretty clean case going forward. There was no need to call her. You would have also heard in the PSR, through PSR, about some very significant conduct that he had prior convictions for in the state with some threatening and menacing type of behavior. He also heard about another relationship this individual had with a person in Denmark, in the Netherlands. Very disturbing, deviant behavior that the court specifically mentioned in his rationale for imposing his sentence. In imposing his sentence, the judge imposed a 360-month, which is the maximum statutory sentence for count one of the indictment, and a 240-month sentence, which is the maximum sentence for count two of the indictment to run concurrent, consecutive with one another. The other counts three, four, five, and six were ordered to run concurrent in some form or fashion. As far as the witness tampering and the corrupt persuasion, I think the court has already made that determination. While there may be a split in the circuit, this court has already determined by U.S. v. Kraft what corruptly persuade means in endorsing its own model instructions that the court used in this particular case, as well as U.S. v. Pennington, which this court specifically endorsed, that corruptly persuade means to get someone to provide false information. Well, we know what he was doing with the communications, and as far as the tone goes, Judge Murphy, the communications were all caps. And people who are very knowledgeable of the Internet now know that when somebody uses all caps, you're yelling at somebody. That's the impression that one gets when they receive such a message. So he used a harsh tone in telling J.O.B., Look, don't talk to anybody. You don't know me. And how was she going to relay that to anybody by denying that she didn't know this individual, which would have been a lie? Then he goes on to tell her, You need to make sure J.O.B. doesn't talk to anybody, which is the minor victim in this particular case. It's a continuation of that witness tampering. Then there's further communications about, You need to go to L.O.B.'s phone, take it, and delete any images of myself and her from that phone. So when we talk about the multiplicity, which is Issue 4, and we look at those particular actions that he took, well, I would almost agree with Mr. Morrison if I would have charged two counts of witness tampering, one for L.O.B. and one for J.O.B., because there was one action, one transaction we talked about, don't let L.O.B. talk to anybody as well. But we're talking about two separate crimes when we're talking about the tampering of the evidence and the witness tampering. They have very different elements. In fact, the only element that they share together with one another is element number one. Elements two and three for each of those crimes are vastly different, and under block murder it would be two different crimes. It's no different than if you're practicing major crimes in Indian country and you have an individual that strikes somebody with a metal pipe and they cause serious bodily injury. It's one transaction, but you have two resulting charges for conviction. You have the assault with a dangerous weapon. You have the assault resulting in serious bodily injury. One general intent, one specific intent. This one here, you get two vastly different things. It's don't talk to anybody, tell them you don't know me, tell J.O.B. or make sure she doesn't talk to anybody. Now go get rid of the evidence as well. I believe, Your Honors, that's all the points I wanted to make to the Court today. If there are no other questions from the Court, then I would ask the Court to affirm the convictions, affirm the rulings of the Court, and deny the appeal in total. Thank you, Your Honors. Thank you, Mr. Long. Mr. Morrison. Thank you, Your Honor. As far as the attempt to travel goes, if I'm in a relationship with somebody halfway across the globe and I suggest to that person that I will kill them and then I researched how to kill, then under the government's interpretation of the law, I could be found guilty of attempted murder if I do nothing else. That can't be attempt. Regarding the counterfeit money, the government acknowledges accurately that if Bernhardt had intended to intermix his fake money with real money, that money could be passed. So much is true, that's the Armstrong case, but that's not what happened here. There was no indication that he ever intended to intermix. He never actually really did anything with the money. Regarding multiplicity, I may be misunderstanding the government, but the government seems to be suggesting that the two different crimes were witness tampering of the mom and witness tampering of the daughter. Maybe that was a bit of rhetoric on the government's part, but that's simply not what happened here. We have two different witness tampering claims. Both, it seems, directed at the mom. One takeaway here regarding multiplicity, we've got the way this court approaches multiplicity with the unit of prosecution approach, the distinct impulse approach, and the different transaction approach. Beyond all that, if that doesn't resolve the issue, then we have the rule of lenity. And if you look at 18 U.S.C. 1512, we've got multiple different ways under subsections under subsections that talk about how somebody could tamper with a witness. These seem to be alternate ways to charge somebody with one singular crime. So I think based on all of this court's approaches to multiplicity, ending with the rule of lenity, you have to find in favor of Mr. Bernhardt when it comes to the multiplicity. And on rebuttal, that is really all I have to say. And thank you for considering this case. Thank you, Mr. Morrison. And again, thank you for your CJA service. Thank you. Thank you, counsel, for the argument you provided to the court. In the briefing you submitted, we will take your case under advisement.